**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**IN RE: AVERY L. STARKS,** **Case No. 4:25-bk-10590J**
**(Chapter 7)**

**Debtor.**

**JOSEPH T. RAMEY** **PLAINTIFF**

**VS.** **AP No. 4:25-ap-01030**

**AVERY L. STARKS** **DEFENDANT**

**MEMORANDUM OPINION**

In this adversary proceeding filed by Joseph T. Ramey ("**Ramey**") against Avery L. Starks (the "**Debtor**"), Ramey seeks to have his claim against the Debtor determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B) as a debt obtained by false pretenses, false representations, and actual fraud. Ramey also seeks to have the Debtor's discharge denied pursuant to 11 U.S.C. § 727(a)(2)(A), 727(a)(3), 727(a)(4)(A), (B), and (D), and 727(a)(5). Finally, Ramey cites 11 U.S.C. § 707(a)(1) as grounds for the Debtor's bankruptcy case to be dismissed. The Debtor filed an answer to the complaint stating the allegations are inaccurate and not supported by evidence.

A trial on the merits was held by video transmission on March 12, 2026. Ramey was present and proceeded *pro se*.[1] Ramey testified on his own behalf and called Brandon Butler, his nephew ("**Butler**"), as a witness. Ms. Anh-Thu Cecille Doan appeared on behalf of the Debtor, who also appeared and testified on his own behalf. The Debtor called his wife, Lajoyce Annae

[1] Corporal T. Thomas was also present with Ramey, who was incarcerated at the time of the trial.

Starks ("**Mrs. Starks**"), Butler, and Ramey as witnesses. Exhibits were received into evidence from both parties.

After Ramey presented his case-in-chief, the Debtor's attorney made an oral motion for judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052(c) (the "**Motion**"). (Tr. at 45–46).[2] After hearing arguments on the Motion and for the reasons stated in open court, incorporated herein by reference, the Court granted the Motion, in part, and denied it, in part. First, the Court dismissed the complaint as to the allegations under 11 U.S.C. § 707(a)(1) that the bankruptcy case should be dismissed for unreasonable delay prejudicial to creditors. Next, the Court dismissed the complaint under 11 U.S.C. § 523(a)(2)(B) because the evidence did not support a finding of a written statement to meet the requirements of 11 U.S.C. § 523(a)(2)(B). The Motion was denied as to the remaining counts and the trial proceeded. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court denies Ramey's claims under 11 U.S.C. §§ 523(a)(2)(A), 727(a)(2)(A), (a)(3), 727(a)(4)(B), (D), and 727(a)(5) and grants his claim under 11 U.S.C. § 727(a)(4)(A).

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052.

[2] "Tr." refers to the transcript of the trial held before this Court on March 12, 2026, on the Plaintiff's Complaint against the Debtor Defendant in AP Case No. 4:25-ap-01030.

## II. Facts

### A. The Audi Repairs

The dispute between the parties started in February 2023 when Butler, Ramey's nephew, took Ramey's Audi Q7 motor vehicle (the "**Audi**") to the Debtor for repairs. Ramey wanted the Debtor to replace the timing chain in the Audi with a new one he had purchased to resolve a ticking noise. He had an estimate from Audi that the repairs would cost $6,000.00 and wanted to find a better deal.[3] Ramey was incarcerated at that time, and the conversations between Ramey and the Debtor took place with the use of Butler's cell phone by FaceTime. Ramey was on the telephone with Butler, and Butler was with the Debtor.

It was the Debtor's testimony that prior to taking the Audi to the Debtor for repairs, the Debtor had given him a "5 Star Automotive" business card (the "**Business Card**"). The Business Card had the Debtor's telephone number and the address of 7818 Jericho Rd., North Little Rock, Arkansas. Both Ramey and Butler testified that the Audi was taken to a Mabelvale Pike location for repairs. The name on the building was Glen Daniels, but Butler testified that the Debtor had his own side of the building he used for repair work. This was consistent with the Debtor's testimony that when he worked at Glen Daniels on Mabelvale Pike he was allowed to do repair jobs on the side.

The Debtor admitted that Ramey brought the Audi to him because Ramey had heard good things about him. It was Ramey's testimony that during this initial visit on February 14, 2023, he asked the Debtor if he was licensed, insured, and bonded and the Debtor assured him he was. The Debtor, however, does not recall telling Ramey he was licensed, insured, and bonded. He testified that he was working under Glen Daniels ("**Mr. Daniels**") at the time, and Mr. Daniels

---

[3] Ramey made several statements to "clear up a misunderstanding" during the cross-examination of Butler. The statements were not objected to and became part of the record. (Tr. at 40).

was licensed and bonded but the Debtor, himself, was not. Ramey testified he would not have left the Audi with the Debtor if the Debtor had not assured him he was licensed, insured, and bonded.

Butler testified that he never heard the Debtor say he was licensed, insured, and bonded. Butler did testify, however, that he sent a text message to the Debtor on March 16, 2023, asking him if he was licensed, insured, and bonded and the Debtor responded "yes" to that text message. (Tr. at 43). Butler requested license, insurance, and bond information from the Debtor, but it was never received.

Ramey then asked the Debtor if he knew how to replace the timing chain in an Audi, and the Debtor said he did and told Ramey that Audi of Little Rock sends customers to him for repairs. The Debtor did not offer evidence to contradict this statement. An invoice for the repair work was introduced into evidence reflecting $2,935.90 as the total amount for the repairs. No business name is reflected on the invoice. The Debtor required one-half the cost of repairs to be paid down and the rest was to be paid after the repairs were complete. Satisfied that the Debtor could do the work, the Audi was left with the Debtor along with a new timing chain to install in the Audi to resolve the ticking noise. In addition, following instructions from Ramey, Butler gave the Debtor $1,450.00 in cash. When asked at trial what he did with the money the Debtor responded that he gave it to Mr. Daniels.

The initial meeting was described slightly different by the Debtor. He testified that Butler came to the shop and told him Ramey wanted him to put a new timing chain in his Audi and before accepting the job, the Debtor asked Mr. Daniels if it was okay to take the job. The Debtor did admit he spoke with Ramey on FaceTime and said Ramey was happy he could repair the timing chain because he was saving Ramey a lot of money.

According to the Debtor, when he got into the inside of the Audi he saw what he believed to be a new timing chain, so he called Butler and asked him to come see that a new timing chain was not needed. The Debtor told Butler a new timing chain would not resolve the ticking issue and suggested to Butler that the timing chain Ramey purchased could be returned for a refund, but added that Ramey still owed the balance of original cost of repairs because the Debtor would still have to put the Audi back together.

Butler then asked the Debtor if he could fix ticking noise and the Debtor said he could explaining that he thought the problem was a bolt missing in the exhaust. The Debtor replaced the bolt in the exhaust and put the Audi back together. When the Debtor started the engine the ticking noise was gone.

The repairs were to take only ten days but took twenty-four. Butler picked up the vehicle on March 10, 2023, after the Debtor called and said the repairs were completed. Butler paid the remaining $1,220.00 in cash and drove the Audi from the lot. He noticed the front-end alignment was off, the Audi was smoking, and the ticking noise was still there. Butler sent the Debtor a video to show him the Audi still needed repairs. Butler took the vehicle back to the Debtor who repaired the front-end alignment but did not address the smoking or ticking noise.

It was after Butler went back to pick up the Audi the second time that Ramey decided the Debtor was unable to repair the Audi. Butler testified that he sent the Debtor a text message on March 16, 2023, asking if he was licensed, insured, and bonded and he responded "yes" to that text message. (Tr. at 43). Butler requested the Debtor to send him information concerning his license, insurance, and bond but he never received the information.

Ramey and Butler filed a lawsuit against Albert Snow[4] in the District Court of Pulaski County, Arkansas, Little Rock Civil Division on April 18, 2023. A judgment was entered on January 4, 2024, in the amount of $2,785.00 in favor of Joseph T. Ramey and Brandon Butler Jr. against Avery Starks AKA Albert Snow. (Def.'s Ex. 6).

**B. 5 Star Auto, LLC**

Lajoyce Annae Starks, the Debtor's wife, testified about the business known as 5 Star Auto. The articles of organization for 5 Star Auto LLC were filed August 26, 2020. Mrs. Starks is the sole owner and only officer of the business. The Debtor testified that the business was started for his wife to make extra money and she had the business before he went to work at Glen Daniels.

According to Mrs. Starks, 5 Star Auto buys and sells motor vehicles and does not offer car repair services. She works full time at the University of Arkansas for Medical Sciences ("**UAMS**") as an administration assistant and works at 5 Star Auto when not working at UAMS, including at lunch and on weekends. Mrs. Starks's daughter, sister, brother-in-law, and husband help at the business. The Debtor was referred to as a helper at 5 Star Auto, and Mrs. Starks stated the Debtor is not an employee or independent contractor of the business. When asked why there were no business expenses listed for the relatives who help her at 5 Star Auto she stated:

> Yes, now, Mr. Starks, like since he's my spouse, he doesn't get – make any money off of it, but just because I pay like our lights, water, gas, like since I'm the primary breadwinner. He's just helping me out since I – I'm the primary breadwinner.
>
> And then, with my – my daughter, she's in college right now, so, you know, with me – you know, just in her 20s, of course, and she's my child, I'm going to kind of help her out, so she helps me out. She don't charge me to help out at my business because I'm supporting a college student, you know, so.

[4] The lawsuit was initially filed under what Ramey referred to as a street name or alias name of Albert Snow and was refiled naming Avery Starks as the defendant once Ramey and Butler learned the Debtor's real name.

> And then, with my sister and brother-in-law, you know, I'm there for them, you know, I give them advice, so, yes, they will help me out sometime. My sister, she doesn't even work, so she'll help me out. She's like a helper for me. And then, my brother-in-law, he may wash a few of my little cars, my rental cars. He'll wash it. He don't charge me for it, because he's family. It's kind of like a family oriented , you know, business, so they'll help me and don't charge me.

(Tr. at 94—95.)

Her business is currently located at 5207 South University Avenue in Little Rock, Arkansas. She started leasing the University Avenue location in November 2024 and after making needed renovations, began operating the business on University Avenue in March 2025. Before then, 5 Star Auto was located at 7818 Jericho Road in North Little Rock, Arkansas.

Ramey stated that he received the Debtor's Business Card with 5 Star Automotive listed as his business in February 2023, prior to taking his Audi to the Debtor for repairs. The Debtor denies that he gave Ramey his business card but admitted the Business Card introduced into evidence was his business card. It was his testimony that the Business Card in evidence was not printed until 2025 so he could not have given it to Ramey before 2025. When asked how Ramey could have ended up with his business card the Debtor responded that Ramey or Butler must have sent someone to the new business and asked for a card.

Mrs. Starks was also asked about the Business Card and said she purchased that type of business card in February 2025. On direct examination she testified she did not recall purchasing any previous business cards but on cross-examination she stated that she did not purchase business cards initially in 2020 but over the years did print business cards. When Ramey asked Mrs. Starks how he might have ended up with the Business Card with the Debtor's telephone number she stated that she prints several cards for her helpers to use so one of them may have given a customer one of these cards.

The Business Card introduced into evidence had the Debtor's telephone number on it and Mrs. Starks testified that was so customers could call him and leave a message for her when she was working at UAMS. She still insisted he was a helper and not an employee and stated that "he's helping me because I do pay all the bills. I'm – I'm the primary breadwinner on making the money, so the least he could do is help me out when I need it." (Tr. at 90). She admitted that the Debtor does help with any repairs needed on cars purchased from auction before they are sold.

**C. Petition and Schedules**

The Debtor filed his voluntary petition for relief under the provisions of Chapter 7 on February 25, 2025. His petition, schedules, and Statement of Financial Affairs ("**SOFA**") were introduced into evidence. The Debtor's signature appears on page six of the petition with his declaration that he has examined the petition, and the information is true and correct. The Debtor acknowledged at trial that he signed the schedules stating under penalty of perjury that he read the schedules and they are true and correct. Finally, the Debtor's signature also appears on the last page of the SOFA following his declaration, under penalty of perjury, that the answers to the questions in the SOFA are true and correct. Information reflected in the Debtor's petition, schedules, and SOFA is summarized below.

As to the petition, in response to Question No. 12 the Debtor stated that he is not a sole proprietor of any full-time or part-time business. On his Schedule A/B the only vehicle he listed as being owned, leased, or in which he has a legal or equitable interest was a utility trailer. He listed $480.00 in cash but listed no checking, savings, or other similar financial accounts.

The Debtor listed no secured claims, two priority unsecured claims, and five nonpriority unsecured claims. Three of the five nonpriority unsecured claims are held by plaintiffs in state

court actions, including Ramey, Butler, and Gregory Allen. No executory contracts or unexpired leases are listed and no codebtors are listed.

Schedule I reflects that the Debtor is not employed and his non-filing spouse has $2,257.73 in net monthly income from UAMS and $820.00 from operating a business. Schedule J reflects monthly expenses of $3,075.00 resulting in $2.73 in monthly net income. Mrs. Starks testified that these income figures are correct.

On the SOFA, Question No. 4, the Debtor stated that he did not have any income from employment or operating a business during the two previous calendar years prior to the bankruptcy filing, February 25, 2025. In response to Question No. 5, the Debtor responded "no" to whether he received any other income during the two calendar years prior to the bankruptcy filing. He also responded "no" to Question No. 18, which asked whether he had transferred any property to anyone within two years preceding the bankruptcy filing. In response to Question No. 23, asking if he held or controlled any property that someone else owns (including any property you borrowed from or hold in trust for someone), the Debtor responded he did not. Finally, the Debtor responded "no" to Question No. 27, which asked whether he owned a business as a sole proprietor or was self-employed in a trade, profession, or other activity, either full-time or part-time within four years of filing bankruptcy.

The Debtor did not list a motor vehicle on his schedules but testified he uses vehicles from Mrs. Starks's car business for work purposes. On cross-examination the Debtor was asked to explain how he could be using vehicles from his wife's car business for work purposes if he is unemployed. He explained that he does whatever his wife needs him to do in her car business but is not an employee or independent contractor and is not paid for his work.

Ramey testified that although the Debtor said he does not have a job that he is at work every day. Butler testified that the Debtor indicated to the state court that he did not work but Butler said the Debtor goes to 5 Star Auto every day. The Debtor admitted he does help Mrs. Starks with her car business and explained that he goes to auctions and inspects vehicles she is considering purchasing. Once she buys a vehicle to sell, he will make minor repairs if necessary.

Contrary to this income information, the Debtor's Official Form 122A-1, Chapter 7 Statement of Your Current Monthly Income, listed the Debtor's average monthly income for the past six months as $3,165.97, the exact same amount as it listed for Mrs. Starks. The Debtor testified adamantly that this was not correct and should have been zero. Mrs. Starks, who assisted in filling out the schedules, agreed this was a mistake and said it appears that her income was listed twice.

Ramey, who was incarcerated at the time of the trial, testified that the Debtor sends money to inmates using Cash App and that Ramey has witnessed an inmate receiving money from the Debtor. In addition, three Cash App receipts were introduced into evidence showing that the Debtor also receives money on his Cash App. The receipts were for $600.00 on February 27, 2024; $650.00 on April 12, 2024; and $80.00 on June 7, 2024, all from Gregory Allen. (Plf.'s Ex. 2). The Debtor did not list the Cash App account in his schedules.

The Debtor admitted that he works on cars and considers himself a good repairman. On direct examination the Debtor testified that when he worked at Glen Daniels on Mabelvale Pike he was allowed to do side jobs. He explained that the customers did not know how to order parts online so he would order the parts online and the customers would reimburse him by sending money to his Cash App. Contrary to his statement about doing side jobs, he said the money for the parts was for Glen Daniels's business.

The Debtor contradicted his own testimony about working at Glen Daniels later during the hearing when asked questions by the Court. He was asked how long he worked at Glen Daniels, and he responded that he did not work there but was helping Mr. Daniels get his business prepared for retirement because he was going to leave his business to the Debtor.[5]

## III. Arguments

### A. 11 U.S.C. § 523(a)(2)(A)

Ramey argues that the debt owed to him by the Debtor was obtained by false pretenses, false representations, and actual fraud. He believes the Debtor made false representations by stating that he was licensed, insured, and bonded. The Debtor also represented to Ramey that he knew how to repair Audis and Audi of Little Rock refers people to him. The Debtor argues that the debt has been reduced to a judgment for breach of contract and should be discharged. He also argued he did not make any representations concerning a license, insurance, or bond.

### B. 11 U.S.C. § 727(a)(2)(A)

As to 11 U.S.C. § 727(a)(2)(A), Ramey argues that the Debtor has transferred all his assets to his wife, including the business, to hinder, delay, or defraud his creditors. The Debtor argues there is no proof of a transfer of assets within one year before filing and no evidence to show that the Debtor has hindered, delayed or defrauded Ramey.

### C. 11 U.S.C. § 727(a)(3)

Although the complaint cited to 11 U.S.C. § 727(a)(3), Ramey did not advance any arguments at trial on this cause of action.

### D. 11 U.S.C. § 727(a)(4)(A), (B), and (D)

---

[5] Mr. Daniels died in 2026 before the business was transferred to the Debtor.

Ramey argues that the Debtor claims to have no income on his schedules, but he works every day at 5 Star Auto. He also argues that the Debtor has an interest in 5 Star Auto and has his own auto repair business. Finally, Ramey argues that the Debtor owns motor vehicles not listed on his schedules. The Debtor argues there are no false statements on the bankruptcy petition and schedules that would preclude the Debtor's discharge.

**E. 11 U.S.C. § 727(a)(5)**

Although the complaint cited to Section 727(a)(5), Ramey did not advance any arguments at trial on this cause of action.

## IV. Discussion

Before discussing the causes of action raised by Ramey and the evidence, the Court will discuss the credibility of the Debtor and his wife. Both testified in support of the Debtor, and the Court finds neither of them to be credible witnesses. The Court's credibility findings are based on the demeanor of the witnesses and the inconsistencies in their testimony.

For example, during the trial the Debtor made statements regarding the Business Card Ramey introduced into evidence. The Court believes the testimony of Ramey that the Debtor gave him the Business Card prior to February 2023. The Debtor's testimony that the type of business card Ramey introduced into evidence was not purchased until February 2025 is not supported by the evidence. At the time the Debtor says this Business Card was printed, 5 Star Auto's University Avenue location had been undergoing renovations since November 2024 and was one month away from opening. The Court does not find the testimony credible that the Debtor would have new business cards printed with the old location's address when renovations for the new location were almost complete. The testimony was that 5 Star Auto began operating at the University Avenue location in March 2025.

Mrs. Starks also contradicted her own testimony when discussing the Business Card Ramey introduced into evidence. On direct examination she testified that she purchased that type of card in February 2025 and did not recall purchasing any business cards prior to that time. On cross-examination she changed her testimony and said that at first in 2020 she did not purchase any business cards but over the years did print some business cards for her helpers. Mrs. Starks's testimony concerning the helpers she has for her business was also not credible. Mrs. Starks testified that her sister and brother-in-law work at 5 Star Auto without compensation because it is a "family oriented" business and she is "there for them" and "give[s] them advice." (Tr. at 95). The Court finds it doubtful that Mrs. Starks's sister and brother-in-law would work at 5 Star Auto without some type of compensation.

These are just a few examples. In addition, statements made by the Debtor and Mrs. Starks were also contradicted by documentary evidence. For all the reasons stated, the Court does not find the testimony given by the Debtor or Mrs. Starks credible.

**A. Dischargeability under 11 U.S.C. § 523(a)(2)(A)**

Ramey's dischargeability cause of action is brought under 11 U.S.C. § 523(a)(2)(A), which provides that a discharge under Section 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

"Generally, to succeed in having a debt excepted from discharge under Section 523(a)(2)(A) for false pretenses or a false representation the creditor must prove that '(1) the debtor made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately

caused the creditor damage.'" *Snow v. Holmes (In re Holmes)*, No. 3:24-ap-01032, 2026 WL 146903, at *11 (Bankr. E.D. Ark. Jan 16, 2026) (quoting *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014)).

The creditor bears the burden of proving these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

> [I]n determining whether a particular debt falls within the ambit of an exception to discharge under 11 U.S.C. § 523, it was the intention of Congress that the statute should be construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system.

*Ramsey Nat'l Bank & Tr. Co. v. Dammen (In re Dammen)*, 167 B.R. 545, 549 (Bankr. D.N.D. 1994) (citations omitted). Failure to prove even one of the elements results in the debt being discharged. *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006).

An analysis of the first, second, and fifth elements resolves the issue before the Court leaving no need for the third and fourth elements to be discussed. The analysis of the first element varies depending on the cause of action asserted. "Where the cause of action asserted is false pretenses, the first element is met when there is an 'implied misrepresentation or conduct intended to create and foster a false impression.'" *Snow*, 2026 WL 146903, at *12 (quoting *Sheri J. Palmer Revocable Tr. v. Stephens (In re Stephens)*, No. A21-4023, 2022 WL 17587184, at *2 (Bankr. D. Neb. Dec. 12, 2022)). "False pretenses are shown 'when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise' and fails to correct what would otherwise be a false impression." *Id.* (quoting *Merchs. Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)).

"When the cause of action asserted is false representation, the first element is met by an express representation that is false at the time made." *Id.* (first citing *CNA Fin. Corp. v. Flood*

*(In re Flood)*, 498 B.R. 806, 811 (Bankr. S.D. Ohio 2013); and then citing G*alvin v. Cole (In re Cole)*, 164 B.R. 947, 949 (Bankr. N.D. Ohio 1993)). "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made." *Nelson*, 357 B.R. at 513.

Whether the cause of action asserted is false pretenses or false representation, the debtor's action must also be found to be the proximate cause of the creditor's loss. "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss." RESTATEMENT (SECOND) OF TORTS § 546 (1976); *Smith v. Davenport (In re Davenport)*, 491 B.R. 911, 919 (Bankr. W.D. Mo. 2013) (citations omitted). Comment a to Section 546 adds that the rule is concerned with the question of "whether the misrepresentation made by the defendant has caused the plaintiff's loss at all." RESTATEMENT (SECOND) OF TORTS § 546 cmt. a (1976).

"A fraudulent misrepresentation is a legal cause of pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." RESTATEMENT (SECOND) OF TORTS § 548A (1976); *Davenport*, 491 B.R. at 919 (citations omitted). Legal causation requires that the loss be reasonably expected to occur from the reliance and is a question of foreseeability. *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 70 (1st Cir. 2012) (quoting *Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002)).

At trial, Ramey alleges two primary misrepresentations made by the Debtor. The first is that the Debtor stated he was licensed, insured, and bonded. The second is that the Debtor knew how to repair Audi vehicles and had customers referred to him by Audi of Little Rock. Each of the representations will be analyzed separately below.

***(1) Licensed, Insured, and Bonded***

*(a) Statement on February 14, 2023*

It was Ramey's testimony that he asked the Debtor at the initial meeting on February 14, 2023, on FaceTime if he was licensed, insured, and bonded, and the Debtor assured him he was. The Debtor testified that he does not recall telling Ramey he was licensed, insured, and bonded. Significant to the Court is that Butler, who was using his cell phone for Ramey to be able to FaceTime with the Debtor, testified that he never heard the Debtor say he was licensed, insured, and bonded. The Court finds the weight of the evidence and credibility of the witnesses support a finding that the Debtor did not make a representation to Ramey that he was licensed, insured and bonded during the initial meeting on February 14, 2023. For these reasons, the Court finds Ramey did not meet his burden of proof on the first element and, therefore, under 11 U.S.C. § 523(a)(2)(A) his cause of action based on this representation must fail.

*(b) Statement on March 16, 2023*

Ramey also alleged that the Debtor made a representation by text message that he was licensed, insured, and bonded. Butler testified that on March 16, 2023, he sent the Debtor a text message asking him if he was licensed, insured, and bonded, and the Debtor responded "yes." (Tr. at 43). The Court finds Butler's testimony credible. However, even finding this testimony credible, the Court questions whether the Debtor was responding that he was licensed, insured, and bonded or that Glen Daniels was instead. The Debtor did acknowledge that he did not individually have a license but Mr. Daniels had a business license and was insured.

Even if the Court finds the Debtor made the statement in the text message and knew it was false at the time, the fifth element of Section 523(a)(2)(A) cannot be met by this representation. The fifth element requires the statement to be the proximate cause of the debt.

Here the debt incurred is the debt of $2,935.90 incurred on February 14, 2023, when Ramey decided to leave the Audi with the Debtor for him to replace his timing chain. Any statement made after that date, here on March 16, 2023, cannot be found to be the cause of the loss incurred by Ramey because it was not made at the time Ramey incurred the debt for the Audi repairs.

For all these reasons, the Court finds Ramey did not meet his burden of proof on the fifth element and, therefore, under 11 U.S.C. § 523(a)(2)(A) his cause of action based on this representation must fail.

***(2) Ability to Repair and Referrals from Audi***

The next two representations Ramey alleged for false pretenses and false representation were that the Debtor knew how to repair Audis and Audi of Little Rock sends people to him for repairs. Since both relate to the Debtor's ability to repair the Audi, they will be discussed together.

Ramey took his Audi to the Debtor because he had heard good things about him. The parties do not dispute the Debtor indicated in the initial meeting he knew how to replace the timing chain on the Audi. Based on the evidence, the Court finds that the Debtor did indicate he knew how to replace the timing chain on an Audi, the service he was being asked to do by Ramey on February 14, 2023. From the evidence presented, it appears to the Court that replacing the timing chain was the entire scope of the work to be performed by the Debtor when the Audi was initially left for repairs.

As to referrals from Audi of Little Rock, the only evidence was Ramey's testimony that the Debtor told him Audi of Little Rock sends customers to him for repairs. No evidence was

introduced to contradict this statement.[6] Therefore, based on the evidence the Court finds that the Debtor stated that Audi of Little Rock has referred customers to him for repairs.

Next the Court must decide whether these statements concerning his ability to repair Audis and Audi of Little Rock referring people to him for repairs were false. When Ramey first approached the Debtor, he asked the Debtor to replace the timing chain in the Audi. The evidence was that the Debtor knew how to do that and proceeded to do just that until he noticed the timing chain in the Audi appeared to be new. After consulting with Ramey, he did not replace the timing chain but put the vehicle back together. He also repaired the front-end alignment after Butler brought the Audi back a second time. This evidence supports a finding that the Debtor knew how to repair Audis. As to the replacement of the timing chain, no evidence was introduced proving that if he had replaced the timing chain as he was hired to do that doing so would have resolved the ticking noise. For all these reasons, the Court finds that the Debtor's statement that he knew how to replace the timing chain on the Audi made on February 14, 2023, was not a false statement.

Although Ramey raises issues with statements made later by the Debtor on March 14, 2023, about a new timing chain already being on the Audi and the missing bolt being the reason for the ticking sound, as explained above, these statements, made after February 14, 2023, were not the proximate cause of Ramey's loss and are not relevant to the analysis under Section 523(a)(2)(A).

For all these reasons, the Court finds Ramey did not meet his burden of proof on the second and fifth elements and, therefore, under 11 U.S.C. § 523(a)(2)(A) his cause of action based on these representations must fail.

---

[6] An objection to hearsay was sustained when Ramey attempted to introduce evidence of a call he made to Audi.

***(3) Actual Fraud***

The Court will now turn to actual fraud. "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan*, 498 U.S. at 287). The Supreme Court explained the cause of action for actual fraud under Section 523(a)(2)(A) stating:

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involve[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs. Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Moen*, 238 B.R. at 790–91 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)). "The concept of actual or positive fraud consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." *Id.* at 791 (quoting *Stentz v. Stentz (In re Stentz)*, 197 B.R. 966, 981 (Bankr. D. Neb. 1996)).

The evidence does not support a finding of actual fraud. Ramey took his Audi to the Debtor to replace the timing chain. The Debtor demonstrated that he could, in fact, replace the timing chain. It was even the Debtor's good reputation for repairing vehicles that caused Ramey to seek him out to repair his Audi. The evidence is convincing that the Debtor did know how to work on Audis, supported by evidence of his repair knowledge of how to reach the timing chain

and replace it and how to fix the front-end alignment. There was no evidence to support a finding of deceit, trickery, or something said or done to circumvent and cheat another. For these reasons, the Court finds Ramey's cause of action under 11 U.S.C. § 523(a)(2)(A) for actual fraud must fail.

**B. Objections to Discharge**

"As courts have widely noted, denying a debtor's discharge is a 'harsh remedy,' and for that reason, courts must construe complaints objecting to discharge strictly in favor of the debtor." *United States Tr. v. Arnold (In re Arnold)*, 652 B.R. 883, 899–900 (Bankr. E.D. Ark. 2023) (quoting *Snyder v. Dykes (In re Dykes)*, 590 B.R. 904, 909 (B.A.P. 8th Cir. 2018), *aff'd*, 954 F.3d 1157 (8th Cir. 2020)). The plaintiff has the burden of proving facts essential to an objection to discharge. FED. R. BANKR. P. 4005.

***(1) 11 U.S.C. § 727(a)(2)(A)***

Ramey alleges that the Debtor's discharge should be denied under Section 727(a)(2)(A) because he transferred property to his wife with an intent to hinder, delay, or defraud his creditors within one year prior to the bankruptcy petition filing. To prevail, Ramey must show by a preponderance of the evidence: "(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate." *Arnold*, 652 B.R. at 901 (quoting *Korte v. I.R.S. (In re Korte)*, 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001)).

For this cause of action Ramey alleged that the Debtor transferred all his assets to his wife, including 5 Star Auto, to hinder, delay, or defraud his creditors. The articles of organization for 5 Star Auto LLC were introduced into evidence and were filed August 26, 2020.

Mrs. Starks is listed in the articles of organization as the sole officer, principal, and registered agent. Mrs. Starks testified that she is currently the sole owner and only officer of the business.

Ramey introduced the Business Card reflecting the Debtor's name, cell phone number, and the business name 5 Star Automotive into evidence.[7] Ramey alleges that the Business Card is evidence of the Debtor's ownership interest in 5 Star Auto.

According to Mrs. Starks she has had several business cards printed over the years for her helpers to use. As to the Debtor's business card, Mrs. Starks testified that he has business cards with his name and cell phone number so customers can reach him and leave a message for her while she is working at UAMS. The use of the business cards for the business was in the ordinary course of her business, and no evidence was introduced to support that the Debtor has ever had an ownership interest in 5 Star Auto.

Based on the evidence, the Court finds the Debtor has had no interest in the business since it was originally organized and, therefore, did not have an interest in the business to transfer to his wife.

No other evidence of transfers was introduced into evidence. For these reasons, the Court finds that Ramey's cause of action under 11 U.S.C. § 727(a)(2)(A) must fail.

***(2) 11 U.S.C. § 727(a)(3)***

Ramey also alleges that the Debtor's discharge should be denied under Section 727(a)(3). "[I]n order to state a prima facie case under section 727(a)(3), a creditor objecting to the discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2)

---

[7] The parties disagreed about when Ramey received this business card. Ramey testified he had the business card before taking the Audi to the Debtor for repairs. The Debtor testified the business card was not printed until February 2025, so he could not have given it to Ramey before February 2023. Mrs. Starks testified that she leased the University Avenue space in November 2024. The Court finds that printing cards in February 2025 with the old Jericho Road address seems unlikely. The Court finds Ramey's testimony that he received the business card in February 2023 more credible.

that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Dykes*, 590 B.R. at 910 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3rd Cir. 1992)).

Although the complaint cited to Section 727(a)(3), Ramey did not introduce evidence or advance any arguments on this cause of action during closing arguments and is deemed to have abandoned this cause of action at trial. For these reasons, the Court finds that Ramey's cause of action under 11 U.S.C. § 727(a)(3) must fail.

***(3) 11 U.S.C. § 727(a)(4)(A)***

Ramey also argues that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(4)(A) for false oaths made in connection with his bankruptcy case. "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Korte*, 262 B.R. at 474 (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)). The debtor must provide "full and complete disclosure of any and all apparent interests of any kind." *Korte*, 262 B.R. at 474 (quoting *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)).

"To prevail on a complaint brought pursuant to 11 U.S.C. § 727(a)(4)(A), the [creditor] must establish that the debtor[] (1) made the statement under oath; (2) the statement was false; (3) the statement was made with fraudulent intent; (4) the debtor knew the statement was false; and (5) the statement related materially to the debtor's bankruptcy." *S. Bancorp S. v. Richmond (In re Richmond)*, 430 B.R. 846, 874 (Bankr. E.D. Ark. 2010) (citing *Hamilton v. Hamilton (In re Hamilton)*, 390 B.R. 618, 624 (Bankr. E.D. Ark. 2008), *aff'd*, 400 B.R. 696 (E.D. Ark. 2009), *aff'd*, 358 Fed.Appx. 762 (8th Cir.) (per curiam)). The plaintiff has the burden of proving facts

to support this cause of action. FED. R. BANKR. P. 4005. While Ramey bears the burden of proof, once he "has introduced evidence that the [D]ebtor committed any of the prohibited acts, the [D]ebtor has the burden of coming forward with evidence to explain his conduct." *Smith v. Cooper (In re Cooper)*, 399 B.R. 637, 646 (Bankr. E.D. Ark. 2009) (citing *Ramsay v. Jones (In re Jones)*, 175 B.R. 994, 997 (Bankr. E.D. Ark. 1994)).

Ramey argues the Debtor's discharge should be denied under Section 727(a)(4)(A) because he made false oaths on his SOFA and schedules by stating he has no income, does not own a business, and owns no motor vehicles. There was also evidence introduced concerning the Debtor's failure to disclose his Cash App in his schedules.

*(a) Business Ownership, Income, Undisclosed Assets*

The first set of statements to be discussed under Section 727(a)(4)(A) are all part of the Debtor's SOFA. In response to Question No. 4, the Debtor stated that he did not have any income from employment or operating a business during the two previous calendar years prior to the bankruptcy filing, February 25, 2025. In response to Question No. 5 the Debtor stated "no" to the question of whether he received any other income during the two calendar years prior to the bankruptcy filing. In response to Question No. 27 whether he owned a business as a sole proprietor or was self-employed in a trade, profession, or other activity, either full-time or part-time within four years of filing bankruptcy, the Debtor responded "no."

In addition to the statements on his SOFA, the Debtor failed to list his Cash App account in his schedules.

*(i) Statements Made Under Oath*

The statements in the Debtor's SOFA were made under oath. The Debtor's signature appears on the last page of the SOFA following his declaration, under penalty of perjury, that the

answers to the questions in the SOFA are true and correct. As to the statements on the schedules, the Debtor acknowledged at trial that he signed the schedules stating under penalty of perjury that he read the schedules and they are true and correct. For these reasons, the Court finds that Ramey met his burden of proving the first element.

*(ii) The Statements Were False*

The Court also finds that Ramey met his burden of proving the second element. The Debtor admitted that he works on cars and considers himself a good repairman. On direct examination the Debtor testified that he worked at Glen Daniels on Mabelvale Pike. Although the record is not clear on the dates the Debtor worked for Glen Daniels, it does support a finding that he worked for Glen Daniels from at least February 14, 2023, when Ramey hired him to repair the Audi until at least June 7, 2024, when he was receiving money from Gregory Allen on his Cash App. No income from this employment is disclosed in his SOFA.

The Debtor also admitted that Glen Daniels allowed him to do side jobs while he was working with him. Butler described the Glen Daniels building as having two sides and said the Debtor used one side of the building for repairing cars. The Court found Butler's testimony credible. This and other testimony support a finding that the Debtor operated a car repair business as a sole proprietor on at least a part-time basis and did so even while working for Glen Daniels.

Ramey introduced three receipts into evidence showing where Gregory Allen sent money to the Debtor on his Cash App. The Debtor testified that all three transfers were reimbursements for parts ordered. The Court does not find his testimony credible. The receipts were for $600.00 on February 27, 2024; $650.00 on April 12, 2024; and $80.00 on June 7, 2024, all from Gregory

Allen. All are round dollar amounts and the money was transferred to the Debtor, not to Glen Daniels.

The repair job the Debtor engaged in for Ramey further supports a finding that the Debtor was operating a car repair business. When asked what he did with the money Butler gave him for the work on the Audi, the Debtor stated he gave it to Glen Daniels. The Court does not find the Debtor's testimony credible that he would not profit monetarily from the side jobs he was allowed to accept.

As to the Cash App, in addition to the Debtor using the Cash App regularly in his business, Ramey testified he has witnessed the Debtor sending money to inmates using his Cash App. The Cash App should have been disclosed in the Debtor's schedules but was not.

For these reasons the Court finds that Ramey has met his burden of proving the second element that statements made in the Debtor's SOFA and schedules were false.

*(iii) Made with Fraudulent Intent with Knowledge of Falsity*

Next the Court must decide if Ramey has proven that the Debtor made the statements with fraudulent intent and knew the statements were false. *Cooper*, 399 B.R. at 646. A plaintiff may establish fraudulent intent under Section 727(a)(4)(A) by circumstantial evidence. *Dantzler v. Zulpo (In re Zulpo)*, 592 B.R. 231, 253 (Bankr. E.D. Ark. 2018). In addition, "statements made with reckless indifference to the truth are regarded as intentionally false" under this provision. *Korte*, 262 B.R. at 474 (quoting *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)). A statement is made "knowingly" if the Debtor "acted deliberately and consciously." *Zulpo*, 592 B.R. at 253 (citing *Merena v. Merena (In re Merena)*, 413 B.R. 792, 815–16 (Bankr. D. Mont. 2009), *aff'd*, No. 08-00046, 2009 WL 4914650 (B.A.P. 9th Cir.)).

In reviewing the evidence as a whole, the Court finds that Ramey has met his burden of proving the third and fourth elements. The false statements were not mere inaccuracies or due to a mistake or inadvertence. Three of the Debtor's five unsecured claims are related to car repairs and involve lawsuits filed against the Debtor in state court. Ramey's Audi was not the only car the Debtor had repaired. The Debtor admitted he works on cars, has worked on cars since 1987, and believes he is a "good repairman." (Tr. at 71). In answering questions about whether he could change the timing chain on Ramey's Audi he testified he could and said he has repaired many Audis. Ramey testified that the Debtor receives payment via cash or Cash App from his customers. Butler testified that in the case of the Audi, he did pay for the repairs in cash.

In his dealings with Ramey the Debtor testified that Butler "came to the shop because he heard good things" about him and asked about putting a timing chain on Ramey's Audi. (Tr. at 57). The Debtor testified he would need Ramey to pay half down and he was saving Ramey money by doing the repairs. When explaining about the new timing chain that appeared to already be in the Audi the Debtor again referred to the repair cost as money Ramey would still have to pay him, not Glen Daniels. The invoice for the repairs was on a blank car repair invoice with no company name and no invoice number.

The Debtor uses his Cash App for his business and uses it to both receive and send cash payments. The schedules, however, reflect no financial accounts.

The evidence supports a finding that the statements made in the SOFA and the nondisclosure of the Cash App in the schedules were made by the Debtor with reckless indifference to the truth. The Debtor's testimony at the trial and the statements made in the SOFA are in direct conflict. The Debtor worked for Glen Daniels and admitted doing work on the side repairing cars. He was allowed space of his own in a building at Glen Daniels to

conduct his repair business. Yet neither the income from Glen Daniels nor the income from his part-time car repair business were disclosed. More significantly, the car repair business itself was not disclosed. In addition, whether he used the Cash App for business or personal financial transactions, the evidence suggested a regular use of the account. The Debtor's failure to list the Cash App in his schedules was also done with a reckless indifference for the truth. For all the reasons stated, the Court finds that Ramey met his burden of proving the third and fourth elements.

*(iv) Material to the Debtor's Bankruptcy*

Ramey has also met his burden of proving the fifth element. Statements are material if they bear "a relationship to the bankrupt's business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence and disposition of his property." *Sears*, 246 B.R. at 347 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam)). Certainly, conducting a car repair business on the side, even if only part-time, is material to the Debtor's business dealings. Not disclosing the business in his SOFA or elsewhere in his schedules hindered the trustee from being able to perform his trustee duties to investigate business assets such as accounts receivable, tools of the trade, and other possible assets. Not disclosing the Cash App would also hinder the trustee from being able to investigate the Debtor's financial affairs both before and after the bankruptcy filing.

Based on the foregoing discussion, the Court finds that Ramey has met his burden of proving the fifth element, resulting in all five elements of 11 U.S.C. § 727(a)(4)(A) being met.

***(4) 11 U.S.C. § 727(a)(4)(B) and (D), 727(a)(5)***

Ramey also alleges that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(4)(B) and (D) and 11 U.S.C. § 727(a)(5). The Court declines to discuss the additional

causes of action for denying discharge finding that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(4)(A).[8]

## V. Conclusion

For all the foregoing reasons, the Court finds that the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(4)(A). The Court finds that Ramey failed to prove his cause of actions under 11 U.S.C. §§ 523(a)(2)(B) and 707(a)(1), as stated by the Court at the trial. The Court also finds that Ramey failed to establish that the debt owed to him by the Debtor should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) or that the Debtor's discharge should be denied under 11 U.S.C. 727(a)(2)(A) and (a)(3). Ramey has established that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(4)(A), so the additional causes of action to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4)(B), (D) and 11 U.S.C. § 727(a)(5) need not be addresses and are dismissed. A separate Judgment will be entered in favor of the Plaintiff, Joseph T. Ramey.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated: 09/28/2026

cc: Joseph T. Ramey -- LEGAL MAIL
#87050
ADC-Varner Unit
Post Office Box 600
Grady, AR 71633

Ms. Anh-Thu Cecille Doan
Law Offices of Cecille Doan

[8] Throughout the trial Ramey argued that the Debtor has the ability to pay his debt and should be ordered by the Court to pay him. Ramey's argument is misplaced. The causes of action pled by Ramey all focus on whether the debt the Debtor owes to Ramey should be discharged in his bankruptcy case. Ability to pay is not at issue for the Court to consider.

111 Center Street
Little Rock, AR 72201

Debtor
Trustee

Notice of No Discharge to be Sent to All Creditors